# Brown *against* Boyd.

A testator devised " unto my son W, all the houses and buildings of what nature and kind soever, that are situate at or about ' Peach Bottom,' on my lands there, and the land whereon they stand, and as much land adjoining as is absolutely necessary for egress and regress, and also the land occupied by the sawmill. And the residue of all the ' Peach Bottom' lands I give and bequeath to my sons W and A, their heirs and assigns for ever, as tenants in common." *Held*, to vest a life estate in the houses and land specifically devised in W, and the remainder in fee in W and A as tenants in common : and upon a proceeding in partition between W and A, whereby the said houses and land were allotted to W, he became seised of the absolute estate in fee.

ERROR to the District Court of *Lancaster* county.

Slater Brown against John O. Boyd and others, heirs at law of Mary Boyd, deceased. This was an action of ejectment for 15 acres of land, in which the parties agreed to the following facts to be considered in the nature of a special verdict :

[Brown v. Boyd.]

James Porter died in the year 1797, seised in fee of a large tract of land at Peach Bottom, in Little Britain township, Lancaster county, including the land in dispute: having on the 3d day of January 1775, made his last will and testament, in which is the following clause:

"I give and bequeath unto my son William all the houses and buildings of what nature and kind soever, that are situate at or about Peach Bottom, on my lands there, whether held by Maryland or Pennsylvania titles, and the land whereon they stand: and also as much land adjoining as is absolutely necessary for egress and regress: and also the land now occupied with the saw-mill, dam, and the races: and also all the advantages of the ferry, save what use my son Andrew may make thereof for his own private conveniency. And the residue of all the said Peach Bottom lands I give and bequeath to my sons William and Andrew, their heirs and assigns for ever, as tenants in common, to be equally divided betwixt them according to quantity and quality, share and share alike."

To December Term 1798, No. 4, in the Circuit Court of Lancaster county, William Porter, devisee above named, prosecuted an action of partition against Andrew Porter, the other devisee, demanding partition of all the lands at Peach Bottom devised to them by the will of their father; in which action on 24th April 1800, there was judgment *quod partitio fiat*. To September Term 1800, No. 1, a *breve de partitione facienda* duly issued thereon: whereupon, by inquisition taken 7th June 1800, before Christian Carpenter, Esq., sheriff, the inquest allotted and assigned 192 acres and allowance, part of the said lands, in the said inquisition particularly described by metes and bounds, together with a lot for a garden, containing part of an acre, in the said inquisition described, and cut off from the eight-acre tract hereinafter mentioned, to Andrew Porter in severalty, to hold to the said Andrew Porter and to his heirs and assigns for ever, in full for his equal half part or share of the premises in the said writ mentioned, being part thereof: and the said inquest allotted and assigned 168 acres and allowance, other part of the said lands, in the said inquisition particularly described by metes and bounds, together with two tracts of warranted land adjoining Oliver Caldwell's land and the river Susquehanna, the one containing 8 acres, more or less, and the other containing 15 acres, more or less, (reserving out of said eight-acre tract the garden lot therein before allotted to Andrew Porter, and the ground on which Andrew Porter built a house on the river-side), to William Porter in severalty; to hold to the said William Porter and to his heirs and assigns for ever, in full for his equal share or half part of the premises in the said writ mentioned, being the residue thereof: which inquisition was duly confirmed by said court.

William Porter and Andrew Porter entered upon and took pos-

[Brown v. Boyd.]

session of the different tracts of land thus allotted and assigned to them respectively in severalty; and by deed of indenture made 23d June 1800, between the said William Porter and Nicholas Boyd, the said William Porter, referring to the said clause in the will of James Porter, deceased, and the above writ of partition and proceedings thereon, conveyed to the said Nicholas Boyd and his heirs the tract of 168 acres and the two tracts above described, containing together 23 acres, with the houses, buildings and appurtenances: being the whole purpart allotted and assigned by the inquest to the said William Porter. Nicholas Boyd, at the time of this conveyance to him, was the son-in-law of William Porter, having previous thereto married Mary, his only daughter, and had been put in possession by William Porter, his father-in-law, of the property conveyed, before the execution of the deed to him. Nicholas Boyd remained in possession till his death; his wife continuing to live with him on the property till her death. After his death (in 1840) his children, the defendants in this suit, came into and continue in the possession thereof. By deed poll dated 22d December 1800, the said Andrew Porter conveyed to Vincent Stubbs and his heirs the tract of 192 acres allotted and assigned to him by the inquest.

William Porter died in the year 1804, leaving Mary Boyd, wife of Nicholas Boyd above named, his only child and heir. Andrew Porter died in the year 1813, leaving two children, John Porter, who has since died, leaving issue, and Eleanor, since married to Edward Hickley, who is still living. Mary Boyd died 30th January 1840, leaving her husband Nicholas Boyd surviving her, and five children by him, John Oliver Boyd, Nicholas A. Boyd, Ann, since married to William A. Brown, Alice Boyd and Stephen W. P. Boyd, who are defendants in this suit. Nicholas Boyd died 22d December 1840; and after his death, on 7th December 1844, by deed poll of that date, John Ehler, Esq., sheriff of Lancaster county, having levied thereon by virtue of due process of law, conveyed to Slater Brown, the plaintiff, and his heirs, all the right, title and interest of the said Nicholas Boyd, of, in and to the tract of 15 acres above described, with the appurtenances.

At the date of the will of James Porter and at the time of his death, all the houses and buildings on his lands at Peach Bottom were erected on the two tracts, one of 8 acres and the other of 15 acres, allotted and assigned as above to William Porter. The land claimed in this action is the said tract of 15 acres above described. The following persons claim to be co-defendants with those already named in the record: Eleanor Hickley, Patrick Ewing, John M. Porter, J. H. Porter, Robert E. Porter, Elizabeth M'Cardle, Ellen Harris, Margaret A. Harland and Sarah Hutton; being, with those already named, heirs of James Porter the testator. The judgment to be entered on the supposition of the necessity of the whole tract of 15 acres being necessary for the enjoy-

[Brown v. Boyd.]

ment of the buildings; their actual necessity for that purpose being reserved as a question for future adjustment.

If under the above statement of facts the plaintiff is entitled to recover, then judgment for the plaintiff with costs; otherwise judgment for the defendants.

That part of the will of James Porter which related to the subject, was as follows:—" Thirdly, I give and bequeath unto my son William all the houses and buildings of what nature and kind soever that are situate at or about Peach Bottom on my lands there, whether held by Maryland or Pennsylvania titles, and the land whereon they stand, and also as much land adjoining as is absolutely necessary for egress and regress; and also the land now occupied with the saw-mill dam and the races; and also all the advantages of the ferry save what use my son Andrew may make thereof for his own private conveniency. And the residue of all the said Peach Bottom lands I give and bequeath to my sons William and Andrew, their heirs and assigns for ever, as tenants in common, to be equally divided betwixt them, according to quantity and quality, share and share alike."

Then after certain specific devises and bequests, and directing his lands in Cumberland county to be sold by his executors, he concluded his will thus:—" I give and bequeath all the residue of my estate, not already bequeathed or hereafter bequeathed, together with the cash arising from the sale of the lands in Cumberland, to be equally divided amongst all my children, whether male or female, married or single. Lastly, I give and bequeath to my daughter Mary Ewing 150 pounds Pennsylvania currency. And finally, I appoint my sons William and Stephen Porter, to be my executors of this my last will and testament, and do hereby revoke and disannul all other wills by me made."

The court below was of opinion that the plaintiff was not entitled to recover, and therefore rendered a judgment for defendants.

*Franklin*, for plaintiffs in error, argued that the will created a life estate in the land in controversy in William, with remainder in fee to William and Andrew; and in support of this position cited 2 *Vent.* 285; 3 *Atk.* 492; 2 *Vern.* 461; 2 *Saun.* 380; 13 *Ves. Jun.* 396; 1 *East* 456; 11 *East* 322. The plaintiff was entitled to recover upon the Statute of Limitations.

*Burrows, contra.* The question depends upon the construction to be given to the word " residue;" and we contend it is but descriptive of the balance of the land, and not the quantity of estate. 4 *Watts* 90; 4 *Kent* 537. The act of the tenant for life will not affect the reversioner so as to bar his right by lapse of time. 4 *Watts* 221; 3 *Watts & Serg.* 520. But the possession of Boyd, who was entitled to the one-eighth, and therefore a tenant in com-

mon, would protect the other heirs from the bar of the Act of Limitations.   10 *Watts* 296 ; 2 *Watts & Serg.* 294 ; 5 *Burr.* 2604 ; 1 *Salk.* 285 ; *Roper on Husband and Wife* 3 ; *Co. Lit.* 42 *a* ; 1 *Term Rep.* 86.

The opinion of the Court was delivered by

Kennedy, J.—The point presented for our consideration arises out of the will of James Porter, made on the 3d day of January 1775.   Among other things, he thereby " gave and devised to his son William all the houses and buildings, of what nature and kind soever, that were situate at or about Peach Bottom, on his lands there, whether held by Maryland or Pennsylvania titles, and the land whereon they stood ; and also as much land adjoining as was absolutely necessary for egress and regress ; and also the land then occupied with the saw-mill, dam and races ; and also all the advantages of the ferry, save what use his son Andrew might make thereof for his own private conveniency.   And the *residue* of *all* the said Peach Bottom lands he gave and devised to his sons William and Andrew, their heirs and assigns for ever, as tenants in common, to be equally divided betwixt them according to quantity and quality, share and share alike."   The testator had other lands mentioned in his will, some of which he thereby disposed of specifically, and others he directed to be sold, and the proceeds thereof to be divided equally among his children.   He also gave a number of money legacies ; and after directing his executors to sell and convey his lands situate in Cumberland county, in Pennsylvania, for cash to the best advantage, he gives and bequeathes, in the close of his will, all the residue of his estate not already bequeathed or thereafter bequeathed, together with the cash arising from the sale of the lands in Cumberland, to be equally divided amongst all his children, whether male or female, married or single. After this residuary clause he gave to his daughter, Mary Ewing, £150, Pennsylvania currency, which is the only gift thereby made afterwards.  The Peach Bottom lands devised to William and Andrew lay in Lancaster county, Pennsylvania, where William sued out a writ of partition from the Circuit Court thereof against Andrew, to December Term 1798, claiming partition to be made between them of all the Peach Bottom lands devised to them in their father's will.   A judgment of partition was obtained, and partition accordingly made thereof by the sheriff, with the aid of an inquest organized for that purpose, allotting and setting out by metes and bounds in severalty to Andrew and his heirs   and assigns, 192 acres and allowance, part of the lands described in the writ of partition, together with a lot for a garden, containing part of an acre, and cut off from the eight-acre tract thereby allotted to William as part of his portion, in full of Andrew's equal half or moiety of the premises described in the writ, and allotting and setting out also, in like manner, by metes and bounds

[Brown v. Boyd.]

in severalty, to William and his heirs and assigns, 168 acres and allowance, other part of the lands in the writ described, together with two tracts, one of eight acres, more or less, reserving thereout that part thereof allotted to Andrew for a garden, and the *other containing fifteen acres, more or less* (being the same with the houses and buildings thereon, devised first above to William by the will of his father), to hold the same as his half or moiety of the premises described in the writ. William and Andrew took the exclusive possession of their respective shares thus parted and allotted to them; and William afterwards, on the 23d of June 1800, by his deed reciting the devises aforesaid to him, and to him and Andrew, by the will of his father, and the partition thereof made as above stated between them, for the consideration therein mentioned sold and conveyed to Nicholas Boyd in fee the said 168 acres, and the said two tracts of eight acres and of fifteen acres, containing together twenty-three acres, with the houses, buildings and appurtenances thereunto belonging. Nicholas Boyd, at the time of this conveyance, was married to the daughter of William, an only child, and had been put in possession of the property by William some time before the execution of the conveyance thereof to him. He held the same and remained in the possession until his death, in 1840, when his children, the defendants below, succeeded to the possession. On the 22d December 1800, Andrew sold and conveyed in fee all his portion of the Peach Bottom lands, allotted to him by the partition, to Vincent Stubbs. William Porter died in 1804, leaving Mary, the wife of Nicholas Boyd, his only child and heir at law, who died on the 30th of January 1840, leaving Nicholas Boyd, her husband, and five children by him, surviving. Nicholas Boyd died the 22d of December 1840, after which the fifteen acres, with the appurtenances thereunto belonging, were taken in execution and sold as his property, for the payment of his debts, as appears by the deed of John Eshler, Esq., then sheriff of Lancaster county, dated the 7th day of December 1844, to Slater Brown, the plaintiff in this case, who, by virtue thereof, claims to recover the same.

The principal objection made by the defendants to the plaintiff's recovery is, that the fifteen acres claimed by him composed and embraced merely that part of the testator's lands situate at or about Peach Bottom, with all the houses and buildings thereon, which were devised to his son William by the first clause of the will recited above, and vested in him, at most, only a life estate, seeing no words of inheritance are superadded thereto, or other words used expressive of a greater interest than a life estate; and that the remainder or reversion of the testator's estate therein, if disposed of at all by the will, was given by the last residuary clause therein, as above recited, to be equally divided amongst all his children. Indeed, it was at first said that it was not disposed of at all by the will; but that was not much pressed. But

[Brown v. Boyd.]

we are of opinion that the reversion in fee of the land in question passed by the clause which followed the devise of it to William immediately, whereby the testator declares, "And the residue of *all* the Peach Bottom lands I give and bequeath to my sons William and Andrew, their heirs and assigns forever, as tenants in common, to be equally divided betwixt them according to quantity and quality, share and share alike." Now it is clear that the fifteen acres in dispute formed a part of what the testator called his Peach Bottom lands, and as he had only given a life estate in the fifteen acres to William, there remained a residue thereof, that is, the reversion in fee, to be disposed of; and when he declares, by the immediately succeeding clause, "the residue of all the *said* Peach Bottom lands I give and bequeath to my sons William and Andrew, their heirs and assigns forever," &c., it not only appears to me that the reversion in fee in the fifteen acres is thereby passed to William and Andrew as tenants in common, but that it was intended by the testator that it should be so. It has been argued that by the term "residue" the testator only intended to designate and give that portion of his Peach Bottom lands which had not been disposed of previously in any way by his will; but giving the residue of *all* the Peach Bottom lands to his two sons in fee would seem to embrace *all* interest in the whole of them which he had remaining to dispose of; and so include the reversion in the fifteen acres, as well as his entire interest in all the other Peach Bottom lands belonging to him. If authority be wanting to support this construction, we have it in *Wheeler* v. *Wolroon*, (*Alleyn's Rep.* 28), where the testator, seised of the manor of D, in Somersetshire, devised the manor to A for six years, and part of his other lands in fee; and then devised as follows: "And the *rest* of *all* my lands in Somersetshire, or elsewhere, I give to my brother and to the heirs of his body." It was objected that the word "rest" extended only to such lands as were not devised before. But it was adjudged by the court that the reversion of the manor passed by the devise "of the *rest* of *all* my lands," &c. Now it will scarcely be imagined that if the term "residue," instead of "rest," had been used by the testator in the case just cited, the decision of the court would have been different from what it was. In truth, the two cases are so strikingly alike, that it is seldom we meet with two so much so.

The same principle has been adopted and followed in other cases, vide *Willowes* v. *Lidcot*, (2 *Vent.* 285, 286); *S. C.*, (*Carth.* 50); 3 *Mod.* 229; *Litton* v. *Faulkland*, (2 *Vern.* 621). So in *Cooke* v. *Gerrard*, (1 *Lev.* 212), it was admitted distinctly that the *reversion* passed by the devise of "all other his lands not before devised or otherwise settled." And in *Harper* v. *Bean*, (8 *Watts* 471), where the testator devised to his wife the farm, fulling-mill and carding-machines on which he lived; then all his personal property; next, two lots of ground; and immediately, by a sweep-

ing clause, he gave to her " all his cash, notes and book accounts, with *whatsoever is not named* that he has any *right* or *claim to*, either in law or equity," and closed by appointing an executor; he had no real estate beside that described in his will: this Court held that the fee simple estate passed in the lands given to the wife by the last recited clause. (See the cases there cited.) The whole tenor of the will, in the present case, would seem to favour this construction of it, as it appears therefrom that it was the intention of the testator to give and divide the whole of his Peach Bottom lands between his two sons, William and Andrew, to the exclusion of all his other children. It can scarcely be believed that he could have intended to include the land and buildings in dispute in the last residuary clause of his will, which divides all equally that *is thereby given among* his children generally; a thing which could not have been effected well, as to the property in question, without converting it first into money by a sale thereof, as he directed in regard to his Cumberland lands. But, having ordered no sale thereof, the presumption would seem to be, that he did not intend to include it in his last residuary devise. It is also apparent, from the partition made between William and Andrew, that they considered themselves tenants in common of the fee in the whole of the Peach Bottom lands, in reversion at least, if not in possession, and as such had partition made of the whole between them. Each accordingly took exclusive possession of his moiety as divided and set apart by metes and bounds. William, in 1800, sold and conveyed all he got by the partition, including the land in dispute here, to his son-in-law, Nicholas Boyd, who held the same in possession as the absolute owner thereof in fee until his death, in December 1840, a period of upwards of forty years. It would seem to be strange if, after such a holding of the land as the owner thereof, it would or could not be made liable for the payment of his debts. For anything that appears to the contrary in the case, the Statute of Limitations would have given him an indefeasible title in fee to the property, and have rendered it liable for the payment of any debts owing by him at the time of his death. It was contended by the counsel for the defendants, that they, being the heirs at law of Mrs Boyd, the wife of Nicholas Boyd, and the heir at law of William Porter, had a title paramount to that which Nicholas Boyd derived by his deed of conveyance from William Porter. But it cannot be, according to the construction given by us to the will of James Porter, the testator, the original owner of the property, that the defendants can have any claim or title paramount to that which Nicholas Boyd derived from William Porter; for they have no claim except what must have descended from their mother, who certainly had none unless it descended from her father, William Porter; but he conveyed all the right which he had or was vested with, as to the fee, either in reversion or in possession, in

1800, to Nicholas Boyd, and consequently nothing remained in him to descend to Mrs Boyd or anybody else. We therefore consider the plaintiff entitled to recover the possession of the property in dispute. The judgment rendered by the court in favour of the defendant is reversed, and judgment given by this Court for the plaintiff.

Judgment reversed.

